# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3581

_____

Donald Hawkins; Amy Hawkins;      *
                                  *
   Plaintiffs-Appellants;       *
                                  *
       v.                *
                                  *
City of Farmington;               *
                                  *
   Defendant-Appellee;          *
                                  *
Farmington Police Department;     *
                                  *   Appeal from the United States
      Defendant;       *   District Court for the
                                  *   Eastern District of Missouri.
Robert L. Walters, individually and  *
in his official capacity as officer of  *
the Farmington Police Department;  *
                                  *
   Defendant-Appellee;          *
                                  *
Missouri State Highway Patrol; John  *
Doe, and all other unknown and    *
unnamed officers and employees of the  *
City of Farmington Police Department  *
and the Missouri State Highway Patrol;  *
                                  *
      Defendants.      *

_____

Submitted: June 18, 1999

Filed: August 16, 1999

_____

Before BOWMAN, HEANEY, Circuit Judges, and LONGSTAFF, District Judge.[1]

_____

HEANEY, Circuit Judge.

Donald and Amy Hawkins appeal an award of summary judgment in favor of the City of Farmington and the City of Farmington Police Department, as well as a grant of judgment as a matter of law in favor of Farmington Police Officer Robert Walters. We reverse in part, affirm in part, and remand this case to the district court for further proceedings not inconsistent with this opinion.

## I. Background

Donald Hawkins ("Hawkins") was severely injured in a collision between a police car and the motorcycle Hawkins was driving. In Count I of the First Amended Complaint, Hawkins brings suit under 42 U.S.C. § 1983 against the City of Farmington (the "City"), the City of Farmington Police Department (the "Department"), and Robert Walters ("Walters"), individually and in his official capacity as a Farmington police officer, alleging violation of his Fourth Amendment rights. In Count II, Hawkins asserts pendant Missouri law claims of negligence against the City, the Department, and Walters. In Count III, Amy Hawkins, Hawkins' spouse, asserts a companion claim for loss of consortium against the City, the Department, and Walters.

_____

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa, sitting by designation.

## A. Undisputed Facts

While conversing with a senior ranking police sergeant in the Farmington High School parking lot, Walters overheard a police radio dispatch from a trooper of the Missouri Highway Patrol stating that the trooper was attempting to overtake a motorcycle that was traveling along Highway 67. Walters did not immediately respond to this dispatch. A few minutes later, Walters' dispatcher notified him that the Highway Patrol was in pursuit of a motorcycle and that the Patrol had made a generalized request for assistance. This dispatch gave the proximate location of the vehicles.

Without receiving any information as to the description of either the motorcycle or its operator, Walters left the high school parking lot and drove to the area of the Bray Road/Maple Road intersection with Highway 67.[2] The police sergeant with whom Walters had been conversing received the same radio transmissions and did not comment on them to Walters, nor did he accompany Walters as Walters left the parking lot. Upon arriving at Highway 67, Walters positioned his vehicle in the median and waited for any southbound motorcycle to appear, during which time Walters overheard another Missouri State Patrol radio report stating that a motorcycle was being pursued along southbound Highway 67. Approximately one-half mile to the north of Walters' stationary position there was a full sweeping curve in the highway. After Walters had waited at idle for approximately two minutes, a southbound motorcycle (operated by Hawkins) traveling in the lefthand lane, closest to the median, emerged from around the bend and appeared for the first time in Walters' line of sight.

---

[2]In the immediate vicinity of the of the Bray Road/Maple Road intersection, Highway 67 is a typical, four-lane divided thoroughfare with two lanes heading north and two lanes heading south; the north and southbound lanes being separated by a wide, grass-covered median.

From the time Walters first saw Hawkins come around the bend on Highway 67 until the time of the collision, there were no reported vehicles in front or back of Hawkins, and the only people to witness the collision were Hawkins and Walters themselves. Also, although there was a reported high-speed chase of a motorcycle miles back, there is no evidence presented in the record that the motorcycle being chased was the same one Hawkins was operating. What actually transpired in the six or seven seconds immediately preceding the collision is, not surprisingly, subject to differing testimony between Hawkins and Walters.

**B. Hawkins' Testimony**

Hawkins testified that at no point during his journey along Highway 67 did he hear police sirens or exceed the posted speed limit, nor had he, prior to coming upon Walters' police car, seen activated emergency police lights. As Hawkins was traveling in the left passing lane along southbound Highway 67, he came around the bend and proceeded toward the Bray Road intersection with Highway 67. Hawkins first became aware of the police car when the distance between Hawkins and the as of yet unmoving police car had diminished to roughly thirty yards. When Hawkins saw the police car, it was sitting in the cut-through median between southbound and northbound Highway 67 facing west (in the direction of, and perpendicular to, the southbound lanes).

Very shortly thereafter, Hawkins noticed that the police car had activated its emergency lights and had begun to move. At this point, Hawkins thought the vehicle was going to turn onto the left lane and travel southbound on Highway 67, so Hawkins changed lanes to the right lane. The police car, however, kept coming straight across southbound Highway 67, into Hawkins' lane and hit Hawkins' motorcycle and Hawkins' person on the left side. (Tr. I at 19-20.) Hawkins, who was wearing a helmet, landed head-first on the concrete, lost consciousness, and came to a stop in a ditch over 165 feet away from the point of collision.

4

Hawkins was transported to Mineral Area Regional Medical Center where he remained for five days before being transported to St. Louis University Hospital due to the seriousness of his injuries. Of the numerous injuries Hawkins sustained as a result of the collision, the two most serious were a broken back and the subsequent amputation of his left leg slightly below the knee. (Tr. I at 56-86.)

Hawkins' expert accident reconstruction witness testified as to his conclusion that the right front corner of the police car ran into the left side of the motorcycle's front wheel around the area of the front disk brake. (Tr. II at 231-32.)

## C.  Walters' Testimony

Walters testified that while still parked in the median, he saw a motorcycle come around the bend, about a half mile to Walters' north, at which time Walters activated his vehicle's overhead emergency lights and siren. When the motorcycle came into view, it was approaching Walters at a high rate of speed. Walters estimated that it took the motorcycle about seven seconds to travel the approximate half-mile distance as measured from rounding the bend in the highway to the site of the collision.[3] After the motorcycle came into view, Walters decided that he would slow it down, or possibly get it to stop, by pulling slowly into the passing lane of southbound Highway 67.

After activating the warning devices, Walters placed the car in drive and began rolling out onto the highway, looking up the road toward the motorcycle. The police car slowly moved onto the road at an idle because Walters neither accelerated nor touched the car's accelerator. Walters testified that he intended to slow down or stop

---

[3]As extrapolated by Hawkins' attorney during direct examination of Walters, such a time-elapsed to distance-covered ratio would necessarily result in Hawkins having been traveling in excess of 250 miles per hour at this point. (See Tr. II at 377-78.)

the motorcycle by means of rolling his police car onto the highway in front of it.[4] Walters stated that he determined the motorcycle to be approaching him at a high rate of speed (see Tr. II at 379, 383, 386), and that he, nevertheless, pulled onto the highway and occupied, at little more than a crawl (see Tr. II at 374-76), the very lane that Walters observed the motorcycle already to be occupying (see Tr. II at 383-84).

As Walters began rolling out into the lefthand lane, he continued to look to the right at the approaching motorcycle, until he lost sight of it due to the interior support

_____

[4] During direct examination of Walters by Hawkins' attorney, the following exchanges occurred. Unless otherwise indicated, questions ("Q") were posed by Hawkins' counsel and answers ("A") provided by Walters.

> Q: Now, when you were waiting there and you saw him come around the corner, you immediately turned on the lights and siren and started moving into his line of traffic, correct?
> A: Yes.
> Q: When did you formulate something in your mind that you were going to move the car forward?
> A: As I seen him coming down the highway, as I began --
> Q: And what did you think in your mind when you saw him coming down the highway?
> A: We need to get this person to slow down or we need to get him to stop before they really hurt somebody.
> Q: And then what did you do to try to get him to stop or try to get him to slow down?
> A: I rolled out onto the highway.
> Q: Do you know how fast he was going at that time?
> A: No.
> Q: Do you have any idea how fast he was going from the time he came around the bend to the time the collision occurred?
> A: Extremely fast because it seemed like it happened just instantaneously.

(Tr. II at 378-79.)

of the car's roof and prisoner cage. (<u>See</u> Tr. II at 380-83.)  A second or two after Walters lost sight of the motorcycle, the collision occurred.  Walters testified that it was his intention to stop the motorcycle.[5]  Walters also testified that he did not intentionally attempt to ram the motorcycle with his police car.[6]

---

[5]During direct examination of Walters by Hawkins' attorney, the following exchanges occurred. Unless otherwise indicated, questions ("Q") were posed by Hawkins' counsel and answers ("A") provided by Walters.

Q: So it was your intention to stop him [Hawkins]?
A: Yes, it would be nice if he would have stopped.
Q: But that was your intention; is that correct?
A: Yes.

(Tr. II at 390-91.)

[6]During cross-examination of Walters by Walters' attorney, the following exchanges occurred. Unless otherwise indicated, questions ("Q") were posed by Walters' counsel and answers ("A") provided by Walters.

Q:  Did you ever that day intentionally try to ram Mr. Hawkins with your police car?
MR. SHALOWITZ [Hawkins' Attorney]:  Your Honor, I'm going to object.  First of all, it's been asked and answered; second, it invades the Provence of the jury to determine his intent based on the surrounding circumstance.
THE COURT: Overruled.
A:  No, I did not.
BY MR. KREHBIEL [Walters' Attorney]:
Q:  Did you on that day ever intentionally try to injure Mr. Hawkins?
A:  No, I did not.

(Tr. III at 435-36.)

7

## II. The District Court's Rulings

The district court granted summary judgment to the City and the Department as to all counts of Hawkins' complaint, but proceeded to a trial before the jury with respect to the allegations against Walters. However, after the plaintiffs presented their evidence over a two-and-a-half-day period, Walters moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Walters argued, inter alia, that Hawkins' evidence failed to establish that Walters had seized Hawkins for purposes of a Fourth Amendment claim under § 1983. Walters also contended that plaintiffs failed to make a submissible negligence claim under Missouri common law because the doctrine of official immunity barred Hawkins' claim.

The district court granted Walters judgment as a matter of law on both Counts I and II. (See App. at 135.) Amy Hawkins' derivative claim of loss of spousal consortium was also dismissed.[7] Subsequently, Hawkins filed a notice of appeal, the adequacy of which is an issue before this court.

## III. Discussion

### A. Hawkins' Fourth Amendment Claim Against Walters

We review judgments as a matter of law de novo. Judgment as a matter of law should be granted where the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons cannot arrive at a contrary verdict. See Lam v. University of Mo. at K.C. Dental Sch., 122 F.3d 654, 656 (8th Cir. 1997). However, the evidence must be considered in the light and with all reasonable inferences most favorable to the party opposed to the motion, and the court

---

[7]The district court's ruling on the issues was an oral one and is set forth on pages 468 through 475 of the trial transcript.

8

must not engage in the weighing or evaluation of evidence or consider questions of credibility.  See Hyatt v. Robb, 114 F.3d 708, 711 (8th Cir. 1997).

The district court granted Walters' motion for judgment as a matter of law on the question of whether Hawkins' Fourth Amendment rights to an unreasonable seizure had been violated.  It did so on the grounds that no seizure had occurred.  In so holding, the court relied on County of Sacramento v. Lewis, 523 U.S. 833 (1998), and California v. Hodari D., 499 U.S. 621 (1991), for the proposition that a police attempt to seize a person does not amount to a seizure within the meaning of the Fourth Amendment, and on Brower v. County of Inyo, 489 U.S. 593, 597 (1989), for the view that no seizure takes place where a "pursuing police car sought to stop [a] suspect only by [a] show of authority represented by flashing lights and continuing pursuit," but accidentally stopped the suspect by crashing into him.

We believe that the district court misread the Supreme Court authority, particularly Brower.  In Brower, petitioners alleged that "under color of statutes, regulations, customs and usages," respondents caused an eighteen-wheel tractor-trailer to be placed across both lanes of a two-lane highway in the path of Brower's flight, "effectively conceal[ing]" this roadblock by placing it behind a curve and leaving it unilluminated, and positioned a police car with its headlights on between Brower's oncoming vehicle and the truck, so that Brower would be "blinded" on his approach. Petitioners further alleged that Brower's fatal collision with the truck was "a proximate result" of this official conduct.  The district court dismissed the complaint for failure to state a claim, concluding that the police had not acted unreasonably under the circumstances.  The court of appeals affirmed on the grounds that no seizure had occurred.  The United States Supreme Court reversed, holding that a seizure had, in fact, taken place.  The Court stated:

> We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

9

It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock--and that he was so stopped.

Id. at 599. The Court further stated: "[A] Fourth Amendment seizure . . . occur[s] . . . only when there is a governmental termination of freedom of movement through means intentionally applied." Id. at 596-97. It reasoned that the roadblock had been erected to stop the plaintiff and that it had accomplished its purpose. In discussing the circumstances under which a Fourth Amendment seizure would occur, the Court gave as an example: if a police cruiser "pulled alongside [a] fleeing car and sideswiped it, producing [a] crash then the termination of the suspect's freedom of movement would [be] a seizure." Id. at 597.

In this case, Hawkins' complaint clearly alleged an intentional stop and Walters denied the allegation. If a motion to dismiss had been made at that point, a denial would have been mandated. The matter proceeded to trial, however, and the evidence summarized earlier in this opinion was presented. Reading this evidence in the light most favorable to the plaintiff, as we must, we are of the view that sufficient evidence was presented from which a jury could have determined that the police officer terminated Hawkins' freedom of movement through means intentionally applied. The jury could certainly find that Walters maneuvered his vehicle into Hawkins' path in his effort to stop or to slow him down and, in fact, stopped him. The evidence was sufficient to bring the case squarely within the purview of Brower: At the very least, a jury could find that Walters sideswiped Hawkins' motorcycle causing the vehicle to crash.

In our view, Lewis and Hodari D. are clearly distinguishable. The first case was not a Fourth Amendment case; it was rather a Fourteenth Amendment, substantive due process case. The facts were that the police in a patrol car were involved in a high-speed chase with a motorcycle in which Lewis was a passenger. The chase ended

10

when the motorcycle tipped over without any contact with the patrol car and Lewis was ejected onto the ground. The patrol car was unable to stop and ran into and killed Lewis. The Court, relying on Hodari D., held that no seizure took place.

In Hodari D., the question was whether a youth running from the police was seized at the moment the police called on him to stop or at the moment he was tackled by the police. The timing was important because between the two moments he dropped a rock of cocaine. The Supreme Court, reversing the California Supreme Court, held that the seizure did not occur until he was actually brought under submission. The Court stated that an arrest requires either physical force or submission to authority. See 499 U.S. at 697.

Here, there is ample evidence for a jury to find that Walters stopped Hawkins. In the words of the Court in Brower, "We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." Brower, 489 U.S. at 599.

However, as Brower makes clear, seizure alone is not enough for § 1983 liability. The seizure must be unreasonable. See id. at 599. The district court did not consider whether Walters' conduct was reasonable under the circumstances because it had decided that a seizure was not involved. Rather, it quoted extensively from Sacramento and decided that "the plaintiffs' claim must fail as no substantive due process rights are infringed. The evidence most favorable to plaintiff shows, at best, recklessness on the part of defendant, a standard far lesser than the shock the conscience threshold which they are held to meet." (Tr. III at 474.) Not only do we not have a high-speed chase here, but Fourth Amendment liability is not predicated on an intent to harm suspects physically or to worsen their legal plight. The questions simply are: Was there a seizure and was the seizure unreasonable.

11

Reasonableness of the seizure must be determined on the totality of the circumstances and is to be judged from the perspective of a reasonable officer on the scene without regard to the underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment seizure out of an objectively reasonable use of force, nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Graham v. Connor, 490 U.S. 386, 396-97 (1989); Scott v. United States, 436 U.S. 128, 137-39 (1978). Here, there is evidence from which a jury can find that Walkers' conduct was unreasonable. It follows that on remand the district court shall submit to a jury the questions of whether, under the facts and circumstances of this case, a seizure occurred and whether the seizure was reasonable under the standard established by the Supreme Court.

Walters finally argues that even if he seized Hawkins and even if the seizure were unreasonable, he is entitled to qualified immunity because it was not clearly established in September 1994 that his actions in creation of a partial roadblock with means of escape would violate any constitutional right. We disagree. Brower was decided in 1989, five years before this incident occurred, and as we have held, that case established the law to be applied here.

**B. Hawkins' Negligence Claim against Walters.**

We believe, however, that the district court did not err in granting judgment as a matter of law in favor of Walters with respect to Hawkins' claim that Walters was negligent.

The district court based its decision on this issue on the grounds that Walters' actions were discretionary and not ministerial and therefore Walters was entitled to official immunity. Hawkins asserts that Walters' actions in the instant matter were ministerial, and therefore outside the scope of the official immunity doctrine. We are not persuaded.

12

A "discretionary act" is one that requires "the exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued." Bachman v. Welby, 860 S.W.2d 31, 33 (Mo. Ct. App. 1993) (citations omitted). We conclude that Walters' attempt to slow down or stop Hawkins was the product of his own judgment and therefore discretionary.

As Walters' accurately points out, in the state of Missouri the official immunity doctrine holds that a public official is not civilly liable to members of the public for negligence strictly related to the public official's performance of discretionary duties. See Green v. Denison, 738 S.W.2d 861, 865 (Mo. banc 1987). Furthermore, Missouri law clearly holds that police officers are public officials within the meaning of the official immunity doctrine. See id.

Accordingly, we find Walters entitled to official immunity against the claim asserted against him by Hawkins in Count II. The district court's award of judgment as a matter of law in favor of Walters as to Count II is affirmed.

## C. Summary Judgment in Favor of the City and the Department

Hawkins challenges the district court's award of summary judgment in favor of the City and the Department. Of the two arguments proffered by the City in support of affirming summary judgment in its favor, the first involves the notice of appeal document itself. The City argues that Hawkins' notice of appeal does not designate the summary judgment as being the subject of the appeal, and that Hawkins has failed to comply with Federal Rules of Appellate Procedure 3(c), thereby denying this court jurisdiction to hear Hawkins' appeal as it pertains to the City.

On July 9, 1998, the district court granted the City's and the Department's motion for summary judgment against the plaintiffs. On the same day, it issued a judgment that recited that the City and the Department "shall have judgment against plaintiffs . . . and

13

that plaintiffs' claims against defendants shall be dismissed with prejudice." (App. at 130.) The court permitted plaintiffs' case against Walters to proceed. On August 27, 1998, after two and a half days of testimony, the district court directed a verdict in favor of Walters and against the plaintiffs and entered judgment as a matter of law. On September 25, 1998, the plaintiffs filed a notice of appeal with the district court. The caption on the notice read as follows:

> Donald Hawkins and Amy Hawkins,
> Plaintiff(s),
>
> vs.
>
> City of Farmington and Robert Walters,
> Defendant(s).

The case number was listed as "4:96CV2294ERW," identical to the consolidated case in the district court. The notice read as follows: "Notice is hereby given that Plaintiffs appeal to the United States Court of Appeals for the Eighth Circuit from the final judgment entered in this action on the 27th day of August, 1998."

The appellants filed an opening brief on February 3, 1999, in which the appellants argued, *inter alia*, that the district court erred in granting summary judgment for defendants City of Farmington and the Farmington Police Department. In its answering brief, the appellees contended that the appellants had not specifically appealed from the district court order granting summary judgment to the City and therefore this court lacks jurisdiction to hear the appellants' appeal from that order. Appellees went on to argue the issue on the merits.

As the City correctly asserts, Federal Rule of Appellate Procedure 3(c) requires a notice of appeal to "designate the judgment, order, or part thereof appealed from." Fed. R. App. P. 3(c)(1)(B). "However, there is 'a policy of liberal construction of

14

notices of an appeal in situations where intent is apparent and there is no prejudice to the adverse party[.]" McAninch v. Traders Nat. Bank, 779 F.2d 466, 467 n.2 (8th Cir. 1985), cert. denied, 476 U.S. 1182 (1986) (quoting Simpson v. Norwesco, Inc., 583 F.2d 1007, 1009 n.2 (8th Cir. 1978)). Such a view is consistent with the general premise that the requirements of the rules of procedure should be liberally construed and mere technicalities should not foreclose our consideration of a case on its merits. See Torres v. Oakland Scavenger Co., 371 U.S. 312, 316 (1988).

In McAninch, this circuit recognized that dismissal of an appeal from orders granting summary judgment to certain defendants and dismissing a certain party as plaintiff was not required even where a single notice of appeal filed in two consolidated cases did not specify appeal from those orders, because the intent to appeal the orders was apparent and appellees had not demonstrated prejudice.

The rationale utilized in McAninch is equally applicable to the facts of the instant matter. The intent to appeal the order granting summary judgment in favor of the City and the Department was apparent given the procedural history of the case and the fact that the summary judgment was granted forty-nine days prior to the district court's rendering of the judgment as a matter of law for Walters, which was unambiguously referenced by the notice of appeal, the listing of the City in the caption of the notice of appeal, as well as the use of a common case number on both district court orders.

Additionally, Federal Rules of Appellate Procedure 3(d) prescribes that "[t]he district clerk must serve notice of the filing of a notice of appeal by mailing a copy to each party's counsel of record–excluding the appellant's–or, if a party is proceeding pro se, to the party's last known address." Fed. R. App. P. 3(d)(1). It is undisputed that this requirement was honored in this case. Moreover, the appeal information form, although filed after the thirty days permitted for the notice of appeal, was nonetheless filed well before either brief was due. That form made it clear that both orders were

being appealed.  See ELCA Enters, Inc. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186 (8th Cir. 1995).

That Hawkins intended to appeal both the summary judgment order and the judgment as a matter of law was made further apparent by the information contained in the appellants' notification of appendix preparation, designation of record, and statement of issues form.[8]  Thus, all the supporting papers indicated the intent to appeal the earlier summary judgment order, and that intent to appeal was sufficiently demonstrated so as to put the City on notice of the appeal as concerned them.[9]  This is made self-evident by the fact that at no point has the City averred lack of adequate notice.  See Foman v. Davis, 371 U.S. 178 ( 1967).  Finally, the parties have fully addressed the merits of the district court's granting summary judgment in favor of the City and the Department in their briefs,[10] and during oral arguments[11] before this court,

_____

[8]See Blitzstein v. Ford Motor Co., 288 F.2d 738, 740 (5th Cir. 1961) (holding that in determining whether provision of an earlier version of Federal Rules of Appellate Procedure 3(c), also requiring specification of judgment or part thereof appealed from, has been complied with, appellate court may look to statement of points and designation of contents of record on appeal).

[9]See Simpson v. Norwesco, Inc., 583 F.2d 1007, 1009 n.2 (8th Cir. 1978) (deciding that despite fact defendant's notice of appeal referred to district court's order denying motion for judgment notwithstanding verdict or for new trial, where plaintiff received notice adequate to inform her that final decision itself would be appealed, court of appeals, in accordance with its policy of liberal construction of notices of appeal, would consider appeal on merits in situations where intent was apparent and there was no prejudice to adverse party).

[10]See Comfort Trane Air Conditioning Co. v. Trane Co., 592 F.2d 1373, 1390 (5th Cir. 1979) (stating that where district court granted partial summary judgment against plaintiffs on state law tort claims but plaintiffs' notice of appeal did not specify order granting partial summary judgment, plaintiffs were not precluded from raising issue on appeal, particularly where defendants were given some notice of plaintiffs' intention to seek review in district court's pretrial order and both sides had  briefed

and the City has failed to identify any prejudice to which it would be subjected in allowing this portion of the appeal to proceed.[12]

The City, in supporting its contention that the appellants have failed to perfect their appeal against the City and it should therefore be dismissed, relies on Klaudt v. U.S. Department of Interior, 990 F.2d 409 (8th Cir. 1993), and Berdella v. Delo, 972 F.2d 204 (8th Cir. 1992), for the proposition that omission of ***any*** reference to the order appealed from is more than a technical deficiency and creates a jurisdictional bar to the appeal.  While we have no quarrel with either the cases or the proposition, the fact is that there were references to the summary judgment, and we have delineated these references in this opinion.  Here, it is clear that the "intent to appeal the judgment in question is apparent, and there is no prejudice to the adverse party." Klaudt, 990 F.2d at 411 (quoting Berdella, 972 F.2d at 207).  Thus, we find the City's reliance on Klaudt

---

issue on appeal).

[11] See Duran v. Elrod, 713 F.2d 292, 295 (7th Cir. 1983) (holding that where it was unmistakable that defendants intended to appeal both lower court's opinion ordering release of low-bond detainees in county jail to meet population "cap" and denial of requested modification of consent order, and both issues were addressed in opinion, final appealable order, there was no prejudice to plaintiff pretrial detainees due to notice of appeal failing to designate order denying modification of final decree, since those parties had argued merits of issues on appeal).

[12]See Denver & Rio Grande Western R. Co. v. Union Pacific R. Co., 119 F.3d 847, 848 (10th Cir. 1997)  (finding court of appeals had jurisdiction over appeal, notwithstanding fact that notice of appeal failed to designate orders being appealed from, where appellant's timely-filed docketing statement clearly set forth her intention to appeal from undesignated orders, and appellee had adequate notice of issue being appealed and would not be prejudiced); see also Wetherbee v. Elgin, J. & E. Ry. Co., 204 F.2d 755, 756 (7th Cir. 1953) (ruling that where notice of appeal erroneously gave date new trial motion was overruled instead of date judgment appealed from was entered, and appellee was not misled or prejudiced, mistake was immaterial).

and <u>Berdella</u> misplaced and hold that we have jurisdiction to reach the merits of the summary judgment issue.

This court reviews *de novo* the district court's grant of summary judgment, applying the same standards as the district court. <u>See</u> <u>Rogers v. Caster</u>, 133 F.3d 1114, 1117 (8th Cir. 1998). The district court's decision will be affirmed if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> <u>id.</u> In <u>Salve Regina College v. Russell</u>, 499 U.S. 225, 231 (1991), the Supreme Court noted that "[a]s a general matter, of course, the courts of appeals are vested with plenary appellate authority over final decisions of district courts. <u>See</u> 28 U.S.C. 1291. The obligation of responsible appellate jurisdiction implies the requisite authority to review independently a lower court's determinations." We do so now.

As stated in the memorandum and order of the district court granting the City's and the Department's motion for summary judgment:

> [A]s to defendants City of Farmington and City of Farmington Police Department, plaintiffs are claiming injuries arising from negligent training, not operation of a motor vehicle or dangerous condition of property. Therefore, the Court finds that neither exception [to statutory sovereign immunity in Mo. Rev. Stat. § 537.600][13] applies to defendants City of

---

[13]Missouri Statutes § 537.600 provides, in pertinent part:

537.600. Sovereign immunity in effect--exceptions--waiver of

1. Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following

Farmington and City of Farmington Police Department, and their motion for summary judgment as to Counts II and III [loss of consortium] shall be granted.

(App. at 129.)

We agree with the district court that *if* Hawkins' only claim against the City and the Department was based on their failure properly to train their police officers, the claim is barred by sovereign immunity as neither defendant has waived immunity to such actions. However, we do not believe that the plaintiffs' First Amended Complaint can be read so narrowly. We initially note that the City and the Department and Walters are designated as defendants. Paragraph 19 of the First Amended Complaint refers to the defendants, in the plural. The complaint alleges:

> That Defendant*s* breached their duty and were thereby negligent in one or more of the following ways:
>
> a. Defendant Walters drove at an excessive rate of speed, . . . failed to keep a proper lookout, . . . failed to stop, . . . failed to sound his horn or siren, . . . failed to illuminate his warning signals or overhead flashing lights, . . . failed to swerve or slacken his speed, . . . failed to follow normal police procedure and policy for conducting a high speed chase, . . . failed to use reasonable means to stop Plaintiff's motorcycle, . . . failed to use the highest degree of care in the operation of his vehicle,

---

instances:
(1) Injuries directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment;
(2) Injuries caused by the condition of a public entity's property . . . .

Mo. Rev. Stat. § 537.600 (1994).

. . . failed to terminate the high speed chase when it became evident that unreasonable risk or harm may result.

       k.  Defendant City and Defendant Department failed to implement policies, train, and supervise its officers.

(App. at 51-52 (emphasis added).)  Paragraph 20 alleges:

       That as a direct and proximate result of Defendant*s'* negligence, Plaintiff was forced to suffer and will continue to suffer in the future physical and emotional pain and suffering, permanent physical injury, loss of earnings, loss of future earning capacity, fright, nervousness, indignity, humiliation, insult, loss of marital relationship, comfort and consortium, medical and hospital bills, and will be forced to incur medical bills in the future all to his damage in the amount of Five Million Dollars . . . .

Id. at 52.

As is evident from the complaint, section (k) of paragraph 19 is just that, a sub-part.  The "failure to train" averment is just one of the many components comprising paragraph 19.  A plain reading of Count II, in its entirety, leads this court to the inescapable conclusion that the use of the pronoun "Defendant*s*" (in the plural form) in the opening statement of paragraph 19 was sufficient to implicate and encumber the City within the accompanying allegations of negligent conduct and operation of a police car by Walters.  This court's present reading of Hawkins' complaint was also apparent to the City at an earlier phase of this litigation, as acknowledged and summarized in the Brief of Appellee City at 17:  "Finally, Plaintiffs cite and discuss the case of Stanley v. City of Independence, 1998  WL  55019 (Mo. App. 1998).  Although it is anything but clear, they appear to suggest that the City is liable under the doctrine of respondeat superior."  We note that the City, in its Answer to Plaintiffs' First Amended Complaint, stated:  "Defendants admit that defendant Robert L. Walters was employed as a police officer by defendant City of Farmington on September 29, 1994 and that defendant

20

Walters acted under color of state law and in the course and scope of his Employment." (App. at 55.)

Considered in this light, Missouri law imposes vicarious liability on a city for the negligent actions of its employees acting within the scope of their employment. In June 1999, the Missouri Supreme Court resolved whatever conflicts there may have been in Missouri law on this issue and affirmed a circuit court decision holding that a city is responsible for the negligent actions of its employees where the negligent action was the proximate cause of the injury. See Stanley v. City of Independence, 1999 WL 431096 (Mo. banc 1999) (opinion subject to revision or withdrawal until formally released). Accordingly, we hold that the City is not entitled to summary judgment as a matter of law and reverse the district court on this issue. We remand to the district court for action consistent with this opinion.

For all of the reasons stated herein, we affirm in part, reverse in part and remand for action not inconsistent with this opinion.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

21